IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| AMBER DENNARD,<br><br>　　　*Plaintiff,*<br><br>v.<br><br>HUTCHINSON AUTOMOTIVE GROUP LLC,<br><br>　　　*Defendant.* | CIVIL ACTION NO.<br>**5:24-cv-00007-TES** |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Amber Dennard, an African-American woman, *see* [Doc. 1, ¶ 37], began working for Defendant Hutchinson Automotive Group LLC's Buick GMC Cadillac store on December 1, 2021. [Doc. 20-2, ¶ 1].[1] While at the Buick store, Plaintiff worked under the store's general manager, Steve Winters, and Hutchinson's now-platform director, Frank Reynolds.[2] [*Id.* at ¶ 2]. Then, on April 1, 2022, Plaintiff moved to Hutchinson's Ford store in Forsyth, Georgia, as a sales manager. [*Id.* at ¶ 9].[3] At the

---

[1] The parties largely agree on the basic underlying facts, so the Court primarily cites to Hutchinson's Statement of Undisputed Material Facts [Doc. 20-2].

[2] Previously, Plaintiff and Reynolds worked together at Westside Hyundai in Florida. [Doc. 20-2, ¶ 3].

[3] Plaintiff viewed this transfer as a demotion, despite retaining her same job as sales manager. [*Id.* at ¶ 10

Ford store, Plaintiff reported to Ed Burgess,[4] the store's general manager. [*Id.* at ¶ 11].

During her time at the Ford store, Plaintiff routinely complained to Reynolds about her pay. [*Id.* at ¶ 13]. Her complaints didn't revolve around her race or sex; rather, they focused on the lower salary she received at the Ford store compared to what she earned at the Buick store. [*Id.* at ¶ 14]. Plaintiff also took nearly a week off from work despite being told by Burgess—her supervisor—that any such leave violated Hutchinson's policies. [*Id.* at ¶ 15]. Following this incident, Plaintiff told Christopher Catlett—Hutchinson's part-time, remote payroll administrator[5]—that she "was unhappy about Burgess denying her time off." [*Id.* at ¶ 16].

On July 30, 2022, Burgess left Hutchinson for an opportunity with better pay. [*Id.* at ¶ 17]. On August 15, 2022, Jason Eubanks began working as the Ford store's general manager. [*Id.* at ¶ 19]. Around August 25, 2022, Nate King—an African-American man—interviewed for the general sales manager position. [*Id.* at ¶ 20]. After his interview, King found Plaintiff's business card in his door handle with Plaintiff's cell-phone number written on the back. [*Id.* at ¶ 21]. The next day, King told Reynolds and Eubanks of the "weird" conversation that he and Plaintiff had the night before. [*Id.* at ¶ 22].

---

[4] Ed Burgess is a white man. [Doc. 22, Dennard Depo., p. 424:8–11].

[5] Catlett's email signature (at least for part of the duration of the underlying events) included "HR" as a job title. *See, e.g.*, [Doc. 22-17, p. 2].

After King reported the conversation, Dana Hall—another sales manager—told Reynolds and Eubanks that Plaintiff planned to dissuade King from taking the job so that she and Hall could make more money. [*Id.* at ¶ 25]. Following these conversations, Eubanks informed Jonathan Joyner—Hutchinson Partner and chief financial officer—that he wanted to terminate Dennard. [*Id.* at ¶ 26].

Ultimately, on August 26, 2022, Eubanks and Courtney Snipes—Hutchinson's corporate controller, *see* [*id.* at ¶ 8]—informed Plaintiff of Hutchinson's decision to terminate her employment. [*Id.* at ¶¶ 30–31].

Following her termination, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging that during her employment, she endured a hostile work environment based on Burgess's use of the "n-word,"[6] as well as his general use of racist and sexist slurs. [*Id.* at ¶ 33]. Plaintiff contends that she complained of Burgess's inappropriate behavior via text or email to either Catlett or Reynolds on July 21, 2022. [*Id.* at ¶ 41].

In addition to Plaintiff's complaints,[7] she also contends that Brianna Bray—a white female employee—also complained of the store's "hidden racism and sexism" in

---

[6] Plaintiff contends that Burgess used the "n-word" at least 10-15 times. [Doc. 31-2, ¶ 36].

[7] To be clear, Hutchinson assumes for purposes of its summary-judgment motion, that Plaintiff "did complain to Catlett verbally and sent him (or Reynolds) an email or text message about Burgess' alleged racist and sexist comments on July 21, 2022." [Doc. 20-1, p. 6].

her resignation letter sent to Catlett. [Doc. 31-3, p. 13].[8] Catlett forwarded the complaints

to Reynolds and Snipes, who eventually met with Bray and other employees—but not

Plaintiff—regarding Bray's allegations. [*Id.* at ¶¶ 15–16].

Plaintiff filed this action on December 28, 2023, alleging three counts. First,

Plaintiff contends that Hutchinson violated Title VII's anti-retaliation provisions. [Doc.

1, p. 8]. Second, Plaintiff's Complaint alleges post-employment retaliation in violation of

42 U.S.C. § 1981. [*Id.*].[9] And, finally, Plaintiff contends that Hutchinson violated § 1981

through a hostile work environment theory. [*Id.* at p. 10].

On November 18, 2024, following discovery, Hutchinson filed the instant Motion

for Summary Judgment [Doc. 20].

## LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[8] Hutchinson argues that the Court should disregard Plaintiff's Statement of Additional Material Facts [Doc. 31-3] because, as opposed to the Local Rules of the Northern District of Georgia, "Local Rule 56 of the Middle District of Georgia contemplates only one document to be submitted by the respondent." [Doc. 33, p. 2]. However, Hutchinson reads this Court's Local Rule 56 too narrowly. Local Rule 56 allows the non-movant to "attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends ***there exists a genuine dispute to be tried.***" L.R. 56, MDGA. That contemplates a separate document distinct from a non-movant's response to the movant's "statement of the material facts to which the movant contends ***there is no genuine dispute to be tried.***" *Id.* In other words, the movant must file a statement of ***undisputed*** facts to which the non-movant must respond. The non-movant may, however, file a statement of ***disputed*** facts to be tried. In short, the Court will not disregard Plaintiff's construed Statement of Disputed Material Facts.

[9] Following discovery, Plaintiff is no longer pursuing count II—her post-termination retaliation claim. [Doc. 31-1, p. 6 n.3]. Therefore, the Court **GRANTS** Hutchinson's Motion as to that claim.

matter of law." Fed. R. Civ. P. 56(a).

A factual dispute is not genuine unless, based on the evidence presented, "a reasonable jury could return a verdict for the nonmoving party." *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial responsibility of informing the court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437. The movant may cite to particular parts of materials in the record, including, "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1)(A).[10] "When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party simply may show—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively,

---

[10] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

the movant may provide "affirmative evidence demonstrating that the nonmoving

party will be unable to prove its case at trial." *Id.*

      If this initial burden is satisfied, the burden then shifts to the nonmoving party,

who must rebut the movant's showing "by producing . . . relevant and admissible

evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d

1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does

not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not

significantly probative' of a disputed fact." *Josendis*, 662 F.3d at 1315 (quoting *Anderson*,

477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's

position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

      Further, where a party fails to address another party's assertion of fact as

required by Federal Rule of Civil Procedure 56(c), the Court may consider the fact

undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences

from the facts are jury functions, not those of a judge. *Anderson*, 477 U.S. at 255.

Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for
> trial. Rather, on summary judgment, the district court must accept as fact
> all allegations the [nonmoving] party makes, provided they are sufficiently
> supported by evidence of record. So[,] when competing narratives emerge
> on key events, courts are not at liberty to pick which side they think is more
> credible. Indeed, if "the only issue is one of credibility," the issue is factual,
> and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted).

Stated differently, "the judge's function is not himself to weigh the evidence and

determine the truth of the matter but to determine whether there is a genuine issue for

trial." *Anderson*, 477 U.S. at 249. "The evidence of the [nonmovant] is to be believed, and

all justifiable inferences are to be drawn in his favor." *Id.* at 255. And "if a reasonable

jury could make more than one inference from the facts, and one of those permissible

inferences creates a genuine issue of material fact, a court cannot grant summary

judgment"; it "must hold a trial to get to the bottom of the matter." *Sconiers*, 946 F.3d at

1263.

## DISCUSSION

### I. 42 U.S.C. § 1981 Hostile Work Environment

Plaintiff brings a claim for hostile work environment under § 1981.[11] Such a claim

generally requires a plaintiff to show: (1) she belongs to a protected group;[12] (2) that she

has been subject to unwelcome harassment; (3) the harassment was based on a

protected characteristic; (4) the harassment was "sufficiently severe or pervasive to alter

the terms and conditions of employment and create a discriminatorily abusive working

environment"; and (5) there is a basis for holding the employer liable. *Mendoza v.*

---

[11] Title VII standards apply to § 1981 hostile work environment claims. *Shields v. Fort James Corp.*, 305 F.3d 1280, 1282 (11th Cir. 2002).

[12] Throughout her briefing, Plaintiff mentions sex-based comments made by Burgess. *See, e.g.*, [Doc. 31-1, p. 2]. However, § 1981 only covers race-based discrimination, not sex-based discrimination. *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013); *Runyon v. McCrary*, 427 U.S. 160, 168 (1976).

*Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999).

Let's start at the beginning. Plaintiff is an African-American woman; therefore, for purposes of § 1981, she is a member of a protected class. And, she faced unwelcomed harassment on the basis of that protected characteristic. So, the remaining question becomes whether that harassment rises to the level of severe or pervasive. On this point, "the plaintiff must prove that the environment was both subjectively and objectively hostile." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010).

As for the subjective prong, Plaintiff believes she experienced a hostile work environment based on her race, and Burgess's conduct offended her. *See, e.g.*, [Doc. 22, Dennard Depo., p. 452:7–9]; [*id.* at p. 434:8–17]; [*id.* at p. 426:10–15]; *see also Mendoza*, 195 F.3d at 1246. Next, though, Plaintiff must show that her subjective perception is "objectively reasonable," judged from the perspective of "a reasonable person in the plaintiff's position, considering all the circumstances." *Mendoza*, 195 F.3d at 1246 (internal citations omitted). To aid courts in the objective analysis, the Supreme Court identified four factors to consider when determining whether harassment altered an employee's terms or conditions of employment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.*

District courts in this Circuit have concluded that "[h]owever offensive the term, a single or *occasional* use of a racial epithet is not sufficient to qualify as objectively severe or pervasive conduct." *Gant v. Kash n' Karry Food Stores, Inc.*, No. 807-CV-2086-T-33EAJ, 2009 WL 2163111, at *5 (M.D. Fla. July 17, 2009) (emphasis added). Indeed, the Eleventh Circuit clearly held "the mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee does not rise to a [ ] violation. For . . . harassment to state a claim[,] it must be sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Walker v. Ford Motor Co.*, 684 F.2d 1355, 1359 (11th Cir. 1982).

Here, though, Plaintiff does not contend Burgess's comments were occasional or sporadic. Instead, Plaintiff testified that Burgess used the n-word slur at least 10-15 times during the five months they worked together. [Doc. 22, Dennard Depo., p. 269:18–22]. At another point, Plaintiff testified that she heard Burgess use the slur "[a]t least once a day." [*Id.* at p. 425:11].[13] As Plaintiff explained, when asked how often Burgess

---

[13] Hutchinson argues that the Court should disregard Plaintiff's self-serving testimony. *See* [Doc. 20-1, p. 17 n.6]. However, Hutchinson misreads and stretches Eleventh Circuit precedent to reach that point. First, Hutchinson cites *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 714 (11th Cir. 1984), where the Circuit highlighted self-serving testimony by a corporate representative in an antitrust case, which requires significantly complex findings. Second, in *Williams v. City of Dothan, Alabama*, 745 F.2d 1406, 1415 (11th Cir. 1984), the Circuit simply noted that "In the somewhat different context of challenges alleging discrimination in the selection of grand and petit juries, for example, federal courts have repeatedly stressed that such subjective and possibly self-serving evidence must be viewed with a skeptical eye unless it is supported by more objective facts in the record." Neither of these cases compel the Court to disregard Plaintiff's testimony here.

used the n-word,

> At least once a day. He – he would come in and he would say oh, what y'all [n***as] eating for breakfast. That's – that's just how calm it is for him, and he just thinks it's okay. But he exhorts (sic) his power and authority over us just like do it his way or don't.

[Doc. 22, Dennard Depo., 425:12–17].

Even accepting Plaintiff's testimony of 10-15 instances of Burgess using the slur, a jury must decide the ultimate question regarding severity and pervasiveness. *See, e.g.*, *Baker v. Supreme Beverage Co.*, No. 2:13-CV-00222-AKK, 2014 WL 7146790, at *9 (N.D. Ala. Dec. 15, 2014) (finding use of the n-word eight times "evidence of clear severe and pervasive abuse").[14] As then-Judge Kavanaugh explained,

> [The n-word] has been labeled, variously, a term that "sums up . . . all the bitter years of insult and struggle in America," Langston Hughes, The Big Sea 269 (2d ed. 1993) (1940), "pure anathema to African–Americans," *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001), and "probably the most offensive word in English," Random House Webster's College Dictionary 894 (2d rev. ed. 2000). *See generally* Alex Haley, Roots (1976); Harper Lee, To Kill a Mockingbird (1960). Other courts have explained that "perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of

---

Even more, the Circuit clarified several times that although a statement may be self-serving, "that alone does not permit us to disregard them at the summary judgment stage." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013); *Price v. Time, Inc.*, 416 F.3d 1327, 1345 (11th Cir. 2005), *modified on other grounds by* 425 F.3d 1292 (11th Cir. 2005) ("To hold that testimony under oath by an interested party cannot be substantial evidence of a fact in that party's favor would undermine much of the law on summary judgment. Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving.").

[14] Additionally, Plaintiff testified that Burgess discussed Black women's physique "almost daily," saying that Black women have "big ass[es]." [Doc. 22, Dennard Depo., pp. 432:19—433:11]. Now, it is true that sexual harassment is generally not actionable under § 1981. However, comments involving race are actionable. And, Plaintiff made clear that Burgess's comments were only directed to Black women. [*Id.* at p. 428:5–14].

... '[n*****r]' by a supervisor *in the presence of his subordinates*." *Spriggs*, 242 F.3d at 185. No other word in the English language so powerfully or instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against African–Americans.

*Ayissi-Etoh*, 712 F.3d at 580 (Kavanaugh, J., concurring) (emphasis added); *see also Harris v. Pub. Health Tr. of Miami-Dade Cnty.*, 82 F.4th 1296, 1305 (11th Cir. 2023) (citing then-Judge Kavanaugh's concurrence with approval).

Hutchinson spends most of this portion of its Reply [Doc. 33] arguing that Plaintiff's hostile-work-environment claim must fail because "not a single alleged comment made by Burgess was directed towards her." [Doc. 33, p. 6]. But, as the en banc Eleventh Circuit held in *Reeves*, "words and conduct that are sufficiently [characteristic]-specific and either severe or pervasive may state a claim of a hostile work environment, *even if the words are not directed specifically at the plaintiff*." 594 F.3d at 811 (emphasis added); *see also Walker*, 684 F.2d at 1359 n.2 ("The fact that many of the epithets were not directed at Walker is not determinative.").

Hutchinson also posits that Plaintiff essentially lacks credibility because she cannot name every specific instance of Burgess's racist comments. But, again, she isn't required to do so. *See Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1154 (11th Cir. 2020) (concluding that prior Eleventh Circuit cases do not stand "for the proposition that a plaintiff must recall every specific instance of discriminatory conduct to establish that the conduct was frequent").

Plaintiff also presents sufficient evidence that Burgess's comments impacted her

day-to-day performance at work. Indeed, Plaintiff testified that his race-based comments made it hard for her to "enjoy . . . being at work and enjoy . . . doing [her] job[.]" [Doc. 22, Dennard Depo., p. 434:8–17]; *see also* [Doc. 22-16, p. 8 (text conversation of Plaintiff seeking transfer because of the "constant harassment and hostile work environment")]. Even more, while not directly Plaintiff's experience, another employee under Burgess's supervision quit because of the "amount of hidden sexism and racism in the store" which she found "unnerving." [Doc. 22-22, p. 9]. That is sufficient for a jury to decide if the conduct objectively changed Plaintiff's work environment. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993) (finding there can be a hostile-work-environment claim before "the harassing conduct leads to a nervous breakdown," and that an abusive environment is one that "detract[s] from employees' job performance, discourage[s] employees from remaining on the job, or keep[s] them from advancing in their careers").

As for Hutchinson's liability for Burgess's actions, it may be held liable via vicarious liability since Burgess supervised Plaintiff. As the Supreme Court held in *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998), "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Here, Burgess directly supervised Plaintiff. [Doc. 20-2, ¶ 10 ("Plaintiff's direct supervisor at the Ford store was Ed Burgess, General Manager.")].

Hutchinson argues that it cannot be liable for Burgess's conduct because he resigned on July 30, 2022. [Doc. 33, p. 11]. To support that position, Hutchinson cites *Faragher*, 524 U.S. at 808, and *Climer v. W.C. Bradley Co.*, 198 F. Supp. 2d 1370, 1379 (M.D. Ga. 2002). But, those cases don't quite fit Hutchinson's predicament. Indeed, *Faragher* and *Climer* both discuss remedial actions taken by employers, which can be proffered as an affirmative defense. Here, Hutchinson firmly contends that Burgess resigned because of a better-paying opportunity—not as a result of Hutchinson's discipline for his behavior. *See* [Doc. 20-2, ¶ 17]; [Doc. 23, Reynolds Depo., p. 91:1–4]. Therefore, Hutchinson may not seek refuge in the remedial-action defense on these facts.

In the end, Hutchinson failed to show—as a matter of law—that Plaintiff can't present sufficient evidence of a hostile-work-environment claim. A jury must decide.

## II.    Title VII Retaliation

The anti-retaliation provision of Title VII provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, . . . to discriminate against any individual . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). Traditionally, Title VII retaliation claims are evaluated under the

familiar *McDonnell Douglas*[15] framework. However, as Plaintiff notes, plaintiffs are not

confined to *McDonnell Douglas*, because it "is not, and never was intended to be, the *sine*

*qua non* for a plaintiff to survive a summary judgment motion in an employment

discrimination case." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019); *see*

*also Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).[16] Indeed,

presentation of a convincing mosaic of circumstantial evidence that would allow a jury

to infer intentional discrimination "will always" preclude summary judgment in these

types of cases.[17] *Lewis*, 934 F.3d at 1185 (citation omitted). And a plaintiff can present a

"convincing mosaic" if she can put forth evidence that demonstrates "suspicious

timing, ambiguous statements . . . [,] and other bits and pieces from which an inference

of discriminatory intent might be drawn"; "systematically better treatment of similarly

situated employees"; or "that the employer's justification [was] pretextual." *Id.* (citation

omitted).

      Even under a convincing-mosaic theory of a retaliation claim, a plaintiff "must

---

[15] To establish a prima facie case of retaliation under Title VII via *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), a plaintiff "must show that (1) [she] engaged in statutorily protected activity; (2) [she] suffered a materially adverse employment action; and (3) there was a causal link between the two." *Dixon v. Hallmark Cos.*, 627 F.3d 849, 856 (11th Cir. 2010).

[16] *Wright v. Southland Corp.*, 187 F.3d 1287, 1292 (11th Cir. 1999) ("To assist him in this endeavor, the plaintiff may, *if he chooses*, attempt to establish the *McDonnell Douglas* presumption and thereby force the defendant to articulate a lawful reason for the adverse employment action . . . Alternatively, the plaintiff may forego *McDonnell Douglas* and simply attempt to prove illegal discrimination 'under the ordinary standards of proof.'") (emphasis added).

[17] The Eleventh Circuit recently clarified that the convincing-mosaic theory applies to Title VII retaliation claims. *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1342 (11th Cir. 2023).

still show any protected activity was the but-for cause of the adverse action

challenged." *Small v. City of Hollywood*, 661 F. Supp. 3d 1187, 1202 (S.D. Fla. 2023).

As for causation, a plaintiff must demonstrate that "[her] protected activity was a

but-for cause of the alleged adverse action by the employer." *Univ. of Tx. Sw. Med. Ctr v.*

*Nassar*, 570 U.S. 338, 362 (2013). "The but-for standard asks whether a particular

outcome would not have happened 'but for' the purported cause." *Yelling*, 82 F.4th at

1338 (internal citations omitted). Put another way, "a plaintiff must prove that had [she]

not complained, [she] would not have been fired." *Jefferson v. Sewon Am., Inc.*, 891 F.3d

911, 924 (11th Cir. 2018).

### a.     Catlett Conversation

For purposes of this Motion, Hutchinson assumes that Plaintiff complained to

Catlett on July 21, 2022 — via email or text and verbally—about Burgess's conduct. [Doc.

20-2, p. 6]. And, there is good reason for that assumption. Plaintiff claims that she spoke

with Catlett on the phone at 9:19 a.m. on July 21 and then followed up via text

regarding emails for other employees who knew about the claims she made to Catlett.

[Doc. 22, Dennard Depo., p. 276:8–14]. The text messages show a similar story. [Doc. 22-

16, p. 5]. Therefore, Plaintiff participated in protected conduct.[18]

---

[18] To be sure, Catlett did not clearly deny Plaintiff's claim that she called to complain about Burgess. Instead, when asked "Is it your position, Mr. Catlett, that [Plaintiff] never spoke with you about concerns related to Ed Burgess[?], he said "My position is that I -- she -- I don't have any specific recollection of any specific details of any conversation, ***but she could have, yes***." [Doc. 25, Catlett Depo., p. 35:12–23 (emphasis added)].

The bigger question, though, is whether Plaintiff's conversation with Catlett caused her termination.

First, a plaintiff can show causation using temporal proximity. To invoke causation via temporal proximity, a plaintiff must show "close temporal proximity between the protected conduct and an adverse employment action." *Hulbert v. St. Mary's Heath Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006). The temporal proximity must be "very close" to satisfy the causation requirement. *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1272 (11th Cir. 2017). Here, there is a close temporal proximity between Plaintiff's protected activity—July 21—and her termination—August 26. And, in *Higdon v. Jackson*, the Eleventh Circuit noted its prior holdings declaring that "one month between the protected expression and the adverse action is not too protracted." 393 F.3d 1211, 1220 (11th Cir. 2004). Therefore, the temporal proximity at issue here falls within the bounds of creating an inference of causation.

There is one final problem for Plaintiff, though. It is axiomatic that a supervisor without knowledge of a prior complaint cannot retaliate against an employee. *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997); *Johnson v. Publix Super Mkts., Inc.*, No. 404CV394-RH/WCS, 2005 WL 1876164, at *3 (N.D. Fla. Aug. 8, 2005) ("A manager who is unaware of an employee's protected conduct obviously cannot retaliate against the employee based on that conduct."). Here, Hutchinson argues that the two decisionmakers—Joyner and Eubanks—did not know of Plaintiff's complaints, so any

inference created by the temporal proximity is defeated. [Doc. 33, p. 4]; *see also* [Doc. 29, Joyner Decl., ¶ 14]; [Doc. 27, Eubanks Decl., ¶ 12].

Plaintiff relies on the fact that Catlett testified if "he had received a complaint of discrimination from an employee, that he would have passed it to Snipes, the controller whose role included handling employee grievances, or Reynolds in his capacity as a senior director overseeing general managers." [Doc. 31-1, p. 17]. However, to infer that Catlett actually told Snipes or Reynolds "would be pure speculation" because "'could have told' is not the same thing as evidence that [he] 'did tell.'" *Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1054 (11th Cir. 2020).

Therefore, because Plaintiff failed to show that any decisionmaker actually knew about her complaints to Catlett, this protected activity cannot be the basis for a retaliation claim. But, all is not lost for Plaintiff's Title VII claim.

### b.  <u>King Conversation</u>

On August 25, 2022, Plaintiff spoke with King—the new general sales manager. [Doc. 20-2, ¶¶ 21–22]. In that conversation, Plaintiff contends that King told her that he was "going to be the [general manager] of the store." [Doc. 22, Dennard Depo., p. 352:21–22]. King also informed Plaintiff that "he was going to be replacing [Burgess]." [*Id.* at p. 353:13–14]. In response, Plaintiff testified that she told King about the "environment issues . . . what's going on in the store." [*Id.* at p. 357:11–12]. She also told King about "the harassment, the way [Burgess] speaks, [and] his tone," including

Burgess's use of the n-word. [*Id.* at p. 360:19–20]; [*id.* at p. 420:15–21]. King told Plaintiff that he would protect her. [*Id.* at p. 360:25].

Hutchinson argues that this conversation is not protected conduct because it occurred between two coworkers. [Doc. 33, p. 4 n.7 ("If Plaintiff did complain to King about alleged race discrimination, this would not be a protected activity as she claims, because King was <u>only</u> her co-worker, albeit for one day.")]. But the record isn't so clear that King "was <u>only</u> her co-worker[.]" First, according to Plaintiff's testimony, King presented himself as her supervisor—the new general manager of the store. [Doc. 22, Dennard Depo., p. 352:21–22]. Next, even assuming King to be a general sales manager, Plaintiff also testified that sales managers report to both general managers and general sales managers (albeit at a different store, but the terminology appears to be consistent across the industry). [Doc. 22, Dennard Depo., p. 59:2–6]. In the end, Plaintiff complained about what she perceived as illegal conduct to someone who presented himself as a superior. That is enough—at this stage—to allow a jury to decide if the conversation constituted protected conduct.

Hutchinson acknowledges that King told Reynolds and Eubanks about his conversation with Plaintiff. [Doc. 20-2, ¶ 22]. In that rendition of Plaintiff and King's conversation, Hutchinson contends that King did not tell Reynolds and Eubanks about Plaintiff's race- or gender-based complaints—King only said that Plaintiff tried to "talk him out of coming to work there," and told him that it was "not a good place to work."

[*Id.*]. Hutchinson asserts that Plaintiff intended to dissuade King from taking the job so that she could earn more money. [*Id.* at ¶ 25].

Obviously, Plaintiff sees things differently. She denies attempting to dissuade King from working at the dealership, and instead, insists that their conversations focused on King "being the manager and changing the environment[.]" [Doc. 22, Dennard Depo., p. 367:8–17].

What does all of this mean? In short, a jury must sort out these conflicting stories and perspectives.[19] Viewing the evidence in the light most favorable to Plaintiff, it is plausible that she complained to King about Burgess and the race-based comments

---

[19] It is also unclear from the record who, exactly, decided to fire Plaintiff. In his deposition, Reynolds testified that he did not recommend Plaintiff be fired. [Doc. 23, p. 124:10]. However, Eubanks' declaration sheds some doubt on that testimony. Eubanks says that he and Reynolds heard from King and then: "Thereafter, <u>we</u> discussed terminating Dennard's employment, *to which I agreed*." [Doc. 27, ¶¶ 8–9 (emphasis added)]. There are two salient points in that sentence. First, the "we" seems to imply that Eubanks and Reynolds discussed terminating Plaintiff's employment. Second, "to which I agreed" implies that it was not originally Eubanks' idea, but one that he consented to. That conflicts with Joyner's statement that "Eubanks informed me that he wanted to terminate Dennard, telling me that 'he did not want her part of his team.'" [Doc. 29, ¶ 12].

These small things matter because, although Eubanks and Joyner deny knowing about Plaintiff's prior complaints, there's conflicting testimony about Reynolds' knowledge. [Doc. 29, ¶ 14]; [Doc. 27, ¶ 12]; [Doc. 22, Dennard Depo., p. 444:3–15 (discussing Reynolds' anger that Plaintiff circumvented him by going to HR with her complaints about Burgess)]; *cf. also Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999). And, once again, Hutchinson assumes, for purposes of this Motion, that Plaintiff "did complain to Catlett verbally and sent him (*or Reynolds*) an email or text message about Burgess' alleged racist and sexist comments on July 21, 2022." [Doc. 20-1, p. 6 (emphasis added)]. Therefore, based on that assumption, there is at least a jury-question as to what exactly Reynolds knew about the earlier complaints.

Eubanks' declaration also leaves open the idea that Reynolds impacted his decision, and Joyner testified that he simply went along with Eubanks' recommendation without his own investigation. *Llampallas v. Mini-Cirs., Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998). All of this equates to "suspicious timing, ambiguous statements . . . [,] and other bits and pieces from which an inference of discriminatory intent might be drawn." *Lewis*, 934 F.3d at 1185.

occurring at the store. After that conversation, King went to Reynolds and Eubanks and told them Plaintiff's warning that the store was "not a good place to work." Eubanks then—in the same day—fired Plaintiff, at least in part, for the very conversation with King.[20] That is just too close a call for the Court to make at this stage.[21]

<u>**CONCLUSION**</u>

Based upon the foregoing, the Court **GRANTS-in-part** and **DENIES-in-part** Hutchinson's Motion for Summary Judgment [Doc. 20]. The Court **GRANTS** the Motion as to Plaintiff's claim for post-termination retaliation (count II) but **DENIES** the Motion as to Plaintiff's Title VII retaliation and § 1981 hostile-work-environment claims (counts I & III).

The pretrial conference in this case is set for **May 8, 2025**, and the trial is set to begin on **June 2, 2025**. Contemporaneously with this Order, the Court will issue a pretrial conference order directing the parties to prepare and submit a proposed pretrial

---

[20] Remember, Hutchinson alleges it fired Plaintiff due to her "Failure to follow clear directives from upper management," and because she made "disparaging comments about the business to a new hire." [Doc. 22-19, p. 1].

[21] It is true that Hutchinson also contends it fired Plaintiff for her "failure to follow clear directives from upper management." [Doc. 24-3, p. 1]. That appears to stem from Plaintiff's unauthorized absences earlier in the summer of 2022. [Doc. 20-2, ¶ 30]. But, Hutchinson never reprimanded Plaintiff for that incident. [Doc. 24, Snipes Depo., p. 65:8–18]. Hutchinson's delay in disciplining Plaintiff for those absences is suspect at best.

Regardless, there can be multiple but-for causes. *Yelling*, 82 F.4th at 1339. So, even assuming the absences did cause the termination, if retaliation for protected conduct also played a but-for role, then there is a Title VII problem. *Id.* In other words, it appears plausible enough—based on Hutchinson's inaction on the prior absences incident—that if the King conversation never occurred, Plaintiff wouldn't have lost her job.

order.

**SO ORDERED**, this 25th day of March, 2025.

S/ *Tilman E. Self, III*

**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**